**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 17-cv-2690-WJM-NRN

ESTATE OF DILLON BLODGETT, and
ADRIENNE LEONARD, personally and as personal representative of the Estate of
Dillon Blodgett,

      Plaintiffs,

v.

CORRECT CARE SOLUTIONS, LLC;
CORRECTIONAL HEALTHCARE COMPANIES, LLC. d/b/a "CORRECTIONAL
HEALTHCARE MANAGEMENT, INC.";
MONTROSE COUNTY, COLORADO, a government entity;
SHERIFF RICK DUNLAP, sued in his official capacity;
UNDERSHERIFF ADAM MURDIE, sued in his official capacity;
COMMANDER ALAN MILLER, in his individual and official capacities;
SERGEANT ROGELLE STROLE, in her individual and official capacities;
SERGEANT DEAN MCNULTY, in his individual and official capacities;
SERGEANT BOBBY STRAIT, in his individual and official capacities;
SERGEANT GARYN IVERSON, in his individual and official capacities;
NANCY KLIENAPFEL, in her individual capacity;
UNK Counselor, in his/her individual capacity;
UNK LCSW, in his/her individual capacity;
UNK NURSE, in his/her individual capacity; and
UNK NURSE, in his/her individual capacity;

      Defendants.

_____

**ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS**

_____

      This lawsuit alleges that Dillon Blodgett received constitutionally deficient

medical care while in pretrial detention at the Montrose County Detention Center

("MCDC") in Montrose, Colorado, resulting in Blodgett taking his own life.  Adrienne

Leonard ("Plaintiff"), personally and as the personal representative of the Estate of

Blodgett ("the Blodgett Estate"), sues numerous individuals and entities that are allegedly responsible for Blodgett's death in some way.

Currently before the Court are two motions to dismiss challenging the First Amended Complaint (ECF No. 54). The first motion to dismiss is brought by Defendants Correct Care Solutions, LLC, and Correctional Healthcare Companies, LLC (collectively, "CHC"). (ECF No. 59.) The second motion is brought by "Montrose County, Colorado," Sheriff Rick Dunlap, Undersheriff Adam Murdie, Commander Alan Miller, and Sergeants Garyn Iverson, Dean McNulty, Bobby Strait, and Rogelle Strole (collectively, "the Montrose County Defendants"). (ECF Nos. 61 & 70.) Sheriff Dunlap and Undersheriff Murdie are sued in their official capacities. (ECF No. 54.) Commander Miller and Sergeants Iverson, McNulty, Strait, and Strole are sued in their official and individual capacities. (*Id.*) For the reasons explained below, the motions to dismiss are granted in part and denied in part.

## I. LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim in a complaint for "failure to state a claim upon which relief can be granted." The Rule 12(b)(6) standard requires the Court to "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff." *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007). In ruling on such a motion, the dispositive inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Granting a motion to dismiss "is a harsh remedy

which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotation marks omitted). "Thus, 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" *Id.* (quoting *Twombly*, 550 U.S. at 556).

## II. BACKGROUND

The Court assumes the truth of the following facts pled in the First Amended Complaint (ECF No. 54), documents attached thereto, and documents embraced by the pleadings for purpose of resolving the motions.[1]

This case arises from the tragic and untimely death of Blodgett while in MCDC custody. On November 18, 2015, Blodgett was booked into MCDC. (ECF No. 54 ¶ 38.) Blodgett reportedly refused to speak to anyone for two days. (ECF No. 84-1 at 1.) On November 20, 2015, Blodgett completed the intake and screening process and was placed in solitary confinement in cell C-401. (*Id.* ¶¶ 39–40.) It is unclear from the facts before the Court why Blodgett was placed in solitary confinement.

---

[1] The Montrose County Defendants submit two documents attached to their Reply in Support of Motion to Dismiss. (ECF Nos. 84-1 & 84-2.) When a plaintiff does not incorporate by reference or attach a document to a complaint, but the document is referred to in the complaint and is central to the claims therein, a defendant can submit an indisputably authentic copy for consideration on a motion to dismiss. *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997). Here, the Montrose County Defendants submit an intake assessment prepared by Nancy Klienapfel (ECF No. 84-1), excerpts of which are included in the First Amended Complaint (ECF No. 54 ¶ 45). In addition, Montrose County Defendants submit Blodgett's intake questionnaire (ECF No. 84-2), which is also excerpted in the First Amended Complaint (ECF No. 54 ¶ 41). Because these documents are embraced by the pleadings and central to Plaintiff's claims, the Court will consider them without converting Montrose County Defendants' Motion to Dismiss into a motion for summary judgment.

The Montrose County Sheriff's Office (MCSO) maintains the "MCSO Justice

Center Detention Facility Standard Operating Procedure," which contains procedures

for addressing suicidal inmates. (*Id.* ¶ 92; ECF No. 54-1.) Section 23.107(A) states

> When an arrestee is brought into the Detention Facility, the
> booking staff will complete a screening form, which includes
> asking the arrestee if he/she has ever had a history of
> suicide attempts, (Ask only when not intoxicated). Positive
> responses and/or unusual behavior are immediately brought
> to the attention of all the detention deputies. If the response
> or unusual behavior is determined to be enough to warrant
> calling the Mental Health Center, the Booking Deputy should
> do so.

(ECF No. 54-1.) Section 23.107(B) commands that "[i]nmates that are potentially

suicidal shall be searched thoroughly, and then segregated from the general population

for close observation. Necessary measures will be taken to prevent or eliminate any

immediate danger." (*Id.*)

On the afternoon of November 20, 2015, Blodgett completed an intake

questionnaire. He answered the following questions about his mental health and

thoughts of suicide:

> 19. Are you or have you been receiving mental health
> counseling? (If yes enter note below.)
>     No
> 20. Have you ever thought about committing suicide? (If
> yes enter note below.)
>     Yes
> 21. Are you thinking about now? (If yes enter note below.)
>     No
> 22. Has anyone in your immediate family committed or
> attempted suicide? (If yes enter note below.)
>     No
> 26. Does the person's wrist have any scars? (If yes enter
> note below.)
>     No . . .
> 44. Suicidal? (If yes enter note below.)

No

(ECF Nos. 54 ¶ 41; 84-2 at 3.)  In addition, the intake form beneath the signature line says "Yes states in 'alright' health as of 11/20/15 @ 1350."  (*Id.*)

On November 21, 2015, Sergeant Strole asked Nancy Klienapfel[2] of Midwestern Colorado Mental Health to talk with Blodgett.  (ECF Nos. 54 ¶ 44; 84-1 at 1.)  Klienapfel was at MCDC to assess another inmate, but agreed to examine Blodgett at Sergeant Strole's request.  (ECF No. 84-1 at 1.)  Klienapfel recommended to Sergeant Strole and Blodgett that Blodgett "be able to see Miranda ASAP."  (*Id.* at 2.)  Plaintiff construes this statement as a recommendation that Blodgett receive counseling through Jail Based Behavioral Services.  (ECF No. 54 ¶ 45.)  Klienapfel also assessed Blodgett for suicide risk and stated that he was not a risk.  (ECF No. 84-1 at 2.)  On the "Pre Test Suicide Likert" scale and the "Post Test Suicide Likert" scale, Klienapfel rated Blodgett as "0. No thoughts about suicide.  This is how an average person feels about suicide."  (*Id.* at 1, 9.)  She also commented that Blodgett was "at low risk of self harm but in need of SA counseling and f/u while in the jail."  (*Id.* at 3.)

Blodgett sent written requests for mental health services on November 24, 2015, December 15, 2015, and January 11, 2016.  (ECF No. 54 ¶¶ 46, 53, 58.)  In response to each request, within one day, an unnamed nurse (identified in the First Amended Complaint as "UNK Nurse" and a CHC employee) informed Blodgett that he was "on the list."  (*Id.* ¶¶ 47, 53, 59; ECF No. 54-4.)

---

[2] Defendant Klienapfel's name is spelled in different ways throughout the pleadings. She is identified as "Klienapfel" in the caption, "Kleinapfel" in the First Amended Complaint, and "Kienapfel" on her evaluation of Blodgett.  (ECF No. 54 at 1, ¶ 45; ECF No. 84-1.)  Her answer to the First Amended Complaint uses "Klienapfel," so the Court will follow suit.  (ECF No. 60.)

In addition to Blodgett's own written requests for mental health services, his public defender Kristen Hindman sent an e-mail to Commander Miller on November 30, 2015, "indicating that Mr. Blodgett had a history [of] being on suicide watch while in custody and could benefit from counseling." (ECF No. 54 ¶ 49.) It is unclear exactly what Hindman conveyed to Commander Miller because the e-mail is merely summarized in the First Amended Complaint and not in the record before the Court. Commander Miller responded that same day stating that Blodgett had submitted two requests: one for mental health treatment and another for medical care. (*Id.* ¶ 50.) He told Hindman that Blodgett received medical care that day and was "on the list" to see the mental health provider. (*Id.*)

While in custody, MCDC provided Blodgett with three sessions of mental health services. On December 2, 2015, Blodgett saw a counselor allegedly employed or contracted by CHC ("CHC Counselor"). (*Id.* ¶ 51; ECF No. 54-2.) Blodgett reported to the CHC Counselor that a friend had committed suicide and Blodgett himself was having occasional thoughts of suicide. (ECF No. 54-2 at 1.) CHC Counselor diagnosed Blodgett with depression, anxiety, and some suicide ideation but determined not to start suicide precautions at that time. (*Id.*)

On January 2, 2016, Blodgett saw another mental health provider, identified in the First Amended Complaint as "UNK LCSW" and alleged to be a CHC employee. (ECF No. 54 ¶¶ 54–55; *see* ECF No. 54-3.) UNK LCSW diagnosed Blodgett with major depressive disorder and anxiety. (ECF No. 54 ¶ 56.) Under "prior self-harm," UNK

LCSW noted "hanging – 2 mo[ths] ago–while in DOC." (*Id.*; ECF No. 54-3 at 1.) UNK LCSW did not, however, mark "suicidal" under "thought content." (ECF No. 54-3 at 1.)

On January 14, 2016, Blodgett again saw CHC Counselor, after requesting to see "Mental Health, Brett if possible, for personal mental health-related issues." (ECF Nos. 54 ¶ 60; 54-4; 54-5.) CHC Counselor noted that Blodgett had escaped prior custody at Montrose County Community Corrections "because he was feeling suicidal and needed to get to his parents" and noted that Blodgett had "occasional thoughts" of suicide. (ECF No. 54-5 at 1; ECF No. 54 ¶ 61.) CHC Counselor diagnosed Blodgett with depression and anxiety but determined that suicide precautions were "not applicable at this time." (ECF No. 54-5 at 1; ECF No. 54 ¶ 62.)

On the evening of January 20, 2016, Blodgett was provided a second towel. (ECF No. 54 ¶ 65.) Following a security check around 11:00 p.m., Blodgett was found hanging by his neck from a towel in his cell in solitary confinement. (*Id.* ¶ 66.) MCDC staff was unable to revive Blodgett. (*Id.* ¶ 67.) Three days later, Blodgett was declared dead at St. Mary's Hospital in Grand Junction, Colorado. (*Id.* ¶ 68.)

### III.  ANALYSIS

Before addressing CHC and Montrose County Defendants' motions to dismiss, the Court first clarifies the 42 U.S.C. § 1983 claims at issue.  Claim 1 against all defendants alleges that CHC and Montrose County Defendants deprived Blodgett of his rights by their deliberate indifference to his serious medical needs. (ECF No. 54 ¶¶ 100–10.)  For *pretrial* detainees such as Blodgett, the source of the constitutional

7

right to adequate medical care is the Fourteenth Amendment, not the Eighth. *See Bell v. Wolfish*, 441 U.S. 520, 535 & n.16 (1979).

Claim 2 against all defendants states that CHC and Montrose County Defendants deprived Blodgett of life without due process under the Fourteenth Amendment. CHC contends that Claim 2 is duplicative of Plaintiff's § 1983 deliberate indifference claim. (ECF No. 59 at 11–12.) Plaintiff appears to concede that her Fourteenth Amendment claim is premised on deliberate indifference to medical needs. (ECF No. 73 at 8–9.) Thus, it appears that Claim 2 duplicates Claim 1 and may be dismissed. Alternatively, Plaintiff could be attempting to assert a procedural or substantive due process claim. However, there are no allegations or facts to support a claim that any defendant provided "inadequate process" prior to taking the life of Blodgett or that any challenged governmental action would "shock the conscience of federal judges." *See Zwygart v. Bd. of Cnty. Comm'rs*, 483 F.3d 1086, 1093 (10th Cir. 2007) (internal quotation marks omitted); *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 528 (10th Cir. 1998). Absent any allegations plausibly related to procedural or substantive due process allegations, the Court finds it appropriate to dismiss Claim 2.

Claim 4 against Montrose County Defendants also alleges "Fourteenth Amendment Violations." (ECF No. 54 at 27.) That claim appears to challenge Blodgett's conditions of confinement and access to medical care while in solitary confinement. (*Id.* ¶ 138.) To the extent that Plaintiff challenges Blodgett's access to adequate medical care, this claim is part and parcel of Plaintiff's § 1983 deliberate indifference claim of Claim 1. However, Plaintiff may also be challenging Blodgett's

conditions of confinement before his death.  That challenge is addressed in the analysis below.

**A.**  **CHC Motion to Dismiss (Claims 1, 2, 3, and 5)**

CHC moves to dismiss Plaintiff's § 1983 claims and state law claims for negligence and wrongful death.  The Court will address each in turn.

1.  Municipal Liability for § 1983 Claims

CHC is a business entity, not a natural person.  In the Tenth Circuit, a business entity working on the government's behalf can only be liable through the municipal liability framework established by the Supreme Court in *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  *See Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003); *Smedley v. Corr. Corp. of Am.*, 175 F. App'x 943, 945–46 (10th Cir. 2005).  Under *Monell*, a municipality cannot be liable under § 1983 solely because of the injuries inflicted by employees or agents.  436 U.S. at 694.  Instead, a municipality—or, here, a private entity under contract to provide services to inmates and detainees at MCDC—can only be liable in 42 U.S.C. § 1983 for damages when the entity's "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [constitutional] injury."  *Id.*  "A plaintiff alleging a municipal liability claim must therefore identify a government policy or custom that caused the injury and then demonstrate 'that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury.'"  *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013).  The three elements of a municipal liability claim can be summarized as: (1) official

policy or custom, (2) causation, and (3) state of mind.  If Plaintiff establishes these elements, then CHC may liable, even if its employees are not defendants.  *See Cordova v. Aragon,* 569 F.3d 1183, 1193–94 (10th Cir. 2009).

A municipal policy or custom may be "(1) an officially promulgated policy; (2) an informal custom amounting to a widespread practice; (3) the decisions of employees with final policymaking authority; (4) the ratification by final policymakers of the decisions of their subordinates; or (5) the failure to adequately train or supervise employees."  *Estate of Martinez v. Taylor*, 176 F. Supp. 3d 1217, 1230 (D. Colo. 2016) (citing *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010)).

Here, Plaintiff alleges a widespread practice of CHC providing inadequate medical care to inmates and ignoring "obvious signs and symptoms to deny inmates access to necessary medical care."  (ECF No. 54 ¶¶ 69, 72, 79, 83, 88.)  In support, Plaintiff cites multiple instances of CHC and affiliated entities providing substandard medical care to inmates in Colorado and other states.  (*Id.* ¶¶ 74–90.)  In essence, Plaintiff contends that CHC has such a widespread practice of inadequate medical care at detention facilities, that "providing inadequate medical care" is, in fact, a custom of the company.  In response, CHC argues that Plaintiff has failed to identify "any specific practice of inadequate medical and mental health services at the Montrose County Jail." (ECF No. 59 at 7.)  While Plaintiff's allegations are limited, at this stage, they are sufficient to survive a motion to dismiss.  As the Court understands it, Plaintiff has alleged facts to plausibly support a claim that CHC has a widespread practice of

tolerating substandard or delayed medical care which is, in effect, a problem of failure to train or supervise employees on the provision of adequate medical care.

In addition, Plaintiff has alleged sufficient facts to support causation.  Plaintiff claims that UNK Nurse, UNK LCSW, and CHC Counselor all acted in conformity with CHC's informal custom or practice of tolerating inadequate medical care, and thus provided Blodgett with deficient medical care, which led to him taking his own life.

Finally, Plaintiff has plausibly alleged that CHC is, or should be, aware of its track record of providing deficient medical and mental health care at other, comparable detention facilities.  Deliberate indifference to the serious medical needs of prisoners violates the Fourteenth Amendment rights of pretrial detainees.  *Bell v. Wolfish*, 441 U.S. 520, 535 & n.16 (1979); *see Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976).  In the Court's view, the continued provision of substandard medical care would, with near certainty, result in the deprivation of inmates' constitutional rights.  Plaintiff has alleged that CHC has continuously tolerated substandard care despite knowledge of persistent and widespread deficiencies in the delivery of such care.  Taking these allegations as true for purposes of the instant Motion, it is plausible that CHC maintained its informal custom "with deliberate indifference to an almost inevitable constitutional injury."  *See Ernst*, 697 F. App'x at 933.  Thus, the Court finds that Plaintiff has alleged a claim against CHC for municipal liability under § 1983 and denies CHC's motion to dismiss Plaintiff's § 1983 claim.

While the Court finds that Plaintiff has alleged facts which only just manage to support a plausible claim against CHC at this stage of the litigation, the Court notes that

at the summary judgment stage, Plaintiff will have to support these specific claims with detailed factual assertions and supporting credible evidence.

       2.      Negligence Claim (Claim 3)

Plaintiff also asserts a negligence/wrongful death claim against CHC under two theories of negligence, both of which rest on imputed liability for acts of employees: (1) direct liability for failure to train or supervise employees, and (2) vicarious liability for the negligent acts or omissions of its agents.  (ECF No. 54 ¶¶ 125–26.)  *See Ferrer v. Okbamicael*, 390 P.3d 836, 844 (Colo. 2017) *as modified on denial of reh'g* (Mar. 27, 2017).  For CHC to be liable under either theory of negligence, a CHC employee or agent must have been negligent in some way.  *Ferrer*, 390 P.3d at 844.  The only argument CHC raises to dismiss the negligence claim is that Plaintiff does not identify any purportedly deficient training, policy, or practice or "any specific CHC employee." (ECF No. 59 at 12.)  Essentially, CHC argues that Plaintiff has failed to provide sufficient information to understand the claim and basis therefor.

Federal Rule of Civil Procedure 8 requires only "a short and plain statement showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Although the *Twombly/Iqbal* standard requires "plausibility," it is still true that to satisfy Rule 8(a), the statements in the complaint must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."  *Conley v. Gibson*, 355 U.S. 41, 47 (1957).  Under the notice pleading standard of Rule 8, Plaintiff must provide sufficient information to put CHC on notice as to the basis of their negligence claim.  Fed. R. Civ. P. 8(a).

"We have noted that the nature and specificity of the allegations required to state a plausible claim will vary based on context." *Barnes v. Harris*, 783 F.3d 1185, 1196 (10th Cir. 2015) (alteration incorporated). "Prisoners claiming constitutional violations by officers within the prison [ ] rarely suffer information asymmetry . . . [because] prisoners ordinarily know what has happened to them. *Gee v. Pacheco*, 627 F.3d 1178, 1185 (10th Cir. 2010). However, in this case, Blodgett "who was in the best position to observe what was and was not happening to him, and therefore in the best position to provide facts . . . is dead." *Estate of Walter v. Corr. Healthcare Companies, Inc.*, 232 F. Supp. 3d 1157, 1164 (D. Colo. 2017). There thus exists an "asymmetry of information" beyond what is typical in similar cases. *Id.* (citing *Tantlinger v. Duchaine*, 2015 WL 3941503, at *4 (D. Colo. June 26, 2015)). Given the asymmetry, Plaintiff need not plead claims with a great level of factual specificity.

While Plaintiff does not identify any CHC employee by name, the First Amended Complaint provides sufficient information as to the identities of UNK Nurse, UNK LCSW, and CHC Counselor. The First Amended Complaint contains excerpts of the relevant records and attaches relevant documents, which include the date of the document and signature of each individual. (ECF No. 54 ¶¶ 47, 53, 54; ECF Nos. 54-2; 54-3; 54-4; 54-5.) Plaintiff has provided CHC with sufficient information for CHC to understand the facts on which her claims are premised. Moreover, CHC is in possession of employee data from which CHC without much effort could determine the identities of UNK Nurse, UNK LCSW, and CHC Counselor. The Court thus denies CHC's motion to dismiss for failure to identify individual CHC employees by name.

The Court also finds that Plaintiff has included sufficient factual information as to the nature of her claim for failure to train or supervise such that CHC has fair notice of "what the plaintiff's claim is and the grounds upon which it rests." *Conley*, 355 U.S. at 47. While the pleading of negligent training or supervision is adequate (if limited) at this stage of the litigation, by the summary judgment stage, Plaintiff will have had the benefit of discovery and must be able to articulate the basis for her negligence claim in greater detail.

3.   Adrienne Leonard's Claims in Her Personal Capacity

Plaintiff also brings a "survival" claim against the CHC for alleged negligence and § 1983 violations. (ECF No. 54 ¶ 139–41.) CHC construes this claim as Plaintiff suing CHC in her personal capacity for negligence and violations of § 1983, and moves to dismiss both claims.

a.   *Negligence/Wrongful Death Claim*

Plaintiff's state law claims against CHC are not the model of clarity. Plaintiff styles Claim 3 as "Medical Negligence Causing Wrongful Death" and Claim 5 as "Survival" for CHC's alleged negligence brought by Plaintiff as the heir and personal representative of the Blodgett Estate. Plaintiff does not specify what damages she seeks under Claim 3, but asks for damages including "funeral expenses, emotional distress, pain and suffering, and loss of enjoyment of life" for Claim 5. (ECF No. 54 at 24, 28.) In essence, Claims 3 & 5 assert two separate causes of action: a wrongful death claim and a survival action for negligence.

CHC argues that Plaintiff's claims in her personal capacity for CHC's alleged negligence should be dismissed because "[t]here are no allegations that any action was negligent, with respect to Plaintiff in her personal capacity." (ECF No. 59 at 13.)

The heir of a decedent may bring a wrongful death claim when the decedent's death is "caused by a wrongful act, neglect, or default of another." Colo. Rev. Stat. §§ 13-21-201 & -202. A plaintiff in such a wrongful death action may recover damages, including, with some limitation, damages for "grief, loss of companionship, pain and suffering, and emotional stress." *Id.* § 13-21-203. By contrast, a negligence action survives death and must be brought by the personal representative of the decedent's estate. Colo. Rev. Stat. § 13-20-101 ("All causes of action . . . shall survive and may be brought or continued notwithstanding the death of the person . . . Any action under this section may be brought . . . by or against the personal representative of the deceased."). In such a survival action based on negligence, damages are limited to "loss of earnings and expenses sustained or incurred prior to death and shall not include damages for pain, suffering, or disfigurement, nor prospective profits or earnings after date of death." *Id.* A survival claim brought by the personal representative of decedent's estate does not preclude a separate wrongful death action by an heir (or other proper plaintiff under the statute). *Id.* § 13-20-101.

To the extent that Plaintiff attempts to bring a negligence survival claim against CHC in her personal capacity, she cannot do so. *See id.* § 13-20-101. Any survival claim must be brought by Plaintiff as the personal representative of the Blodgett Estate. *See id.* Thus, to the extent that Plaintiff asserts the negligence claim as a survival

action in her personal capacity, CHC's motion is granted and such claim is dismissed. However, Plaintiff may maintain a negligence claim as the personal representative of the Blodgett Estate.

Plaintiff also appears to assert a wrongful death claim arising out of CHC's alleged negligence, as evidenced by the styling of Claim 3 and request for damages only available under the wrongful death statute. (ECF No. 54 at 24, 28.) Such a claim is properly brought by Plaintiff in her personal capacity as heir to the Blodgett Estate. To the extent CHC moves to dismiss Leonard's negligence/wrongful death claim brought in her personal capacity as heir to the Blodgett Estate, the motion is denied.

The pleading of the state law claims is not entirely clear and would greatly benefit from a clearer and more organized recitation of the factual allegations which plausibly support the legal elements of the claim. Thus, the Court will permit Plaintiff to amend her complaint to clarify her state law claims and damages sought pursuant to those claims.

b. *Section 1983 Claim*

A § 1983 claim "must be based upon the violation of plaintiff's personal rights, and not the rights of someone else." *Archuleta v. McShan*, 897 F.2d 495, 497 (10th Cir. 1990). When a § 1983 violation results in death, the Tenth Circuit permits a survival action by the estate of the deceased victim, but not a wrongful death action. *Berry v. City of Muskogee, Okla.*, 900 F.2d 1489, 1506–07 (10th Cir. 1990). Therefore, the proper plaintiff is the decedent's estate, here the Blodgett Estate, and not any heir or representative personally. *See* Colo. Rev. Stat. § 13-20-101; *id.* § 13-21-201.

Therefore, to the extent that Plaintiff attempts to bring a § 1983 claim in her personal capacity, any such claim is dismissed with prejudice.

**B.      Montrose County Defendants' Motion to Dismiss (Claims 1, 2, 4, and 5)**

Before discussing the § 1983 claims against Montrose County Defendants in their official and individual capacities, the Court first addresses two preliminary issues.

1.      <u>Plaintiff's Personal Claims Against Montrose County Defendants</u>

As discussed above, Plaintiff may not bring claims in her personal capacity for § 1983 violations.  *See Berry*, 900 F.2d at 1506–07.  When a § 1983 violation results in death, only a survival action may be brought.  In Colorado, such a claim is properly brought by the personal representative of the decedent's estate.  *Id.*  Thus, to the extent that Plaintiff attempts to bring such a claim in her personal capacity, that claim is dismissed.

2.      <u>Claims Against "Montrose County, Colorado"</u>

Montrose County Defendants argue that "Montrose County, Colorado" should be dismissed because it is an improperly named party and there are no allegations in the First Amended Complaint against the Board of County Commissioners for the County of Montrose.  (ECF No. 61 at 13–14.)  Plaintiff does not respond to this argument, and so the Court deems it conceded.  (ECF No. 84 at 10; *see generally* ECF No. 74.)  Moreover, the argument is well-founded.  *See Doe v. DiStefano*, 2018 WL 2096347 (D. Colo. May 7, 2018) (deeming an argument conceded where the plaintiff failed to respond and the defendant's argument was well-founded).

Under Colorado law, any suit against a county must be brought in the name of the "board of county commissioners of the county"  Colo. Rev. Stat. § 30-11-105.  "An action attempted to be brought under any other designation is a nullity, and no valid judgment can enter in such a case."  *Calahan v. Jefferson Cnty.*, 429 P.2d 301, 302 (Colo. 1967).  The Tenth Circuit views this statutory provision as jurisdictional.  *Gonzales v. Martinez*, 403 F.3d 1179, 1182 n.7 (10th Cir. 2005).  Therefore, Plaintiff's failure to properly name the board of county commissioners of Montrose County alone is grounds for dismissal.  *See Hand v. Cummings*, 2012 WL 4442752 at *2 (D. Colo. Aug. 8, 2012).

Even if Plaintiff had used the proper name, the First Amended Complaint fails to state a claim against the county or board of county commissioners.  Under Colorado law, a board of county commissioners and a sheriff in the same county are distinct public entities.  *Bristol v. Bd. of Cnty. Comm'rs of Cnty. of Clear Creek*, 312 F.3d 1213, 1219 (10th Cir. 2002).  Thus, a board of county commissioners has no control over the sheriff's employees and is not liable for negligent acts of the sheriff's employees.  *Id.* (citing *Tunget v. Bd. of Cnty. Comm'rs*, 992 P.2d 650, 652 (Colo. App. 2000)).  Thus, "Montrose County, Colorado," even through its board of county commissioners has no control or liability for acts of the Montrose County Sheriff's Office.  *Id.*

Plaintiff does not allege any involvement of a member of the board of county commissioners of Montrose County, any policy of the board, or any act by a decisionmaker of Montrose County in the First Amended Complaint.  In short, Plaintiff fails to state any facts to support a claim against "Montrose County, Colorado" or its

board of county commissioners. *See* Fed. R. Civ. P. 12(b)(6). The Court thus dismisses all claims (Claims 1, 2, 4, and 5) against "Montrose County, Colorado."

    3.    <u>§ 1983 Official Capacity Claims Against Montrose County Defendants</u>

Montrose County Defendants move to dismiss all claims against them in their official capacities. "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (citation omitted). Thus, the official capacity claims against Montrose County Defendants are, in effect, claims against their employer, MCSO. Claims against a municipal entity, such as MCSO, are subject to the municipal liability standard discussed in Part III.A.1. For convenience, the Court repeats the standard here: "A plaintiff alleging a municipal liability claim must therefore identify a government policy or custom that caused the injury and then demonstrate 'that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury.'" *Ernst*, 697 F. App'x at 933 (quoting *Schneider*, 717 F.3d at 769).

To state a claim against MCSO, Plaintiff must identify a custom, policy, or practice that was the moving force behind Blodgett's injuries. *Id.* Plaintiff fails to do so. As Montrose County Defendants note, the only MCSO policy referred to in the First Amended Complaint is the MCSO Justice Center Detention Facility Standard Operating Procedure. (ECF No. 61 at 12.) Plaintiff alleges that individuals at MCDC failed to follow the provisions of this policy for suicidal inmates. (ECF No. 54 ¶¶ 42, 52, 57, 63.) "[U]nder *Monell*[,] subordinate employees impose liability by following policy, not when they disregard it." *Simmons v. Uintah Health Care Special Dist.*, 506 F.3d 1281, 1286

(10th Cir. 2007).  Thus, generally, an individual's failure to follow a municipal policy is obviously not *caused* by a municipal policy.  *S.D. v. Lajeunesse*, 2017 WL 262692, at *5 (D. Colo. Jan. 20, 2017).  The only individual whom Plaintiff alleges failed to abide by the policy is "the deputy who completed the intake form."  (ECF No. 54 ¶ 42.)  All other potential allegations that someone failed to follow the policy are stated in the passive voice[3] or merely implied.[4]  (ECF No. ¶¶ 52, 57, 63.)  Under the facts alleged, the Court finds that Plaintiff has failed to state a municipal liability claim against Montrose County Defendants because Plaintiff has not alleged that Blodgett's injury and death was caused by a municipal policy.  The Court thus dismisses the claim without prejudice.[5]

Plaintiff also posits that Montrose County Defendants "have a policy and practice of providing inadequate medical and mental health services to the inmates."  (ECF No. 54 ¶ 70.)  Plaintiffs provide no facts to support this conclusory allegation.  While Plaintiff

---

[3] *E.g.*, ECF No. 54 ¶ 63 ("Despite a history of specific prior suicide attempts in custody and presenting suicidal ideations, Mr. Blodgett was not properly evaluated for risk of suicide, placed on a suicide watch, or provided proper mental health treatment.").

[4] Plaintiff states that Hindman notified Commander Miller of Blodgett's "history of being on suicide watch while in custody."  (ECF No. 54 ¶ 49.)  Plaintiff does not state that this e-mail should have prompted action by Commander Miller under the policy, but seemingly implies that Commander Miller should have taken some action.  While an action by a final policymaker, even one in defiance of a municipal policy, can be "described as the 'official policy' of a municipality," *see Simmons*, 506 F.3d at 1286, there is no allegation that Commander Miller was under any obligation to act after receiving the e-mail from Hindman.

[5] The parties appear to talk past one another with respect to the *Monell* claim against MCSO.  Plaintiff alleges that individuals at MCDC failed to follow the policy.  (ECF No. 54 ¶ 42.)  Montrose County Defendants respond that those individuals did indeed follow the policy because no defendant or deputy was aware of Blodgett's history of suicide attempts. (ECF No. 61 at 12).  Just the opposite is required to sustain a *Monell* claim; Plaintiff would need to allege that defendants acted pursuant to a policy, and that doing so resulted in the deprivation of constitutional rights.

includes specific factual allegations as to CHC's widespread custom of providing deficient medical care at various detention centers, Plaintiff does not make any allegations specific to MCDC. Absent any factual allegations related to deficient provision of mental health services at MCDC, Plaintiff cannot demonstrate a widespread practice at MCDC.

Finally, with respect to Claim 4 challenging the conditions of Blodgett's confinement, Plaintiff has not alleged any relevant policy of MCSO or MCDC.

In sum, Plaintiff has not identified a municipal custom, policy, or practice that caused Blodgett's injury or death as required to state a § 1983 claim against Montrose County Defendants in their official capacity. The Court thus grants Montrose County Defendants' motion with respect to the § 1983 claims against the named individuals in their official capacity, and dismisses those claims without prejudice.

> 4.    § 1983 Individual Capacity Claims Against Montrose County Defendants & Qualified Immunity

Montrose County Defendants sued in their individual capacity—namely Commander Miller and Sergeants Iverson, McNulty, Strait, and Strole—assert qualified immunity from the individual capacity claims against them. They argue that Plaintiff has failed to allege a constitutional violation by any individual under a theory of direct or supervisory liability.

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). To resolve a

claim of qualified immunity, the Court must consider two elements: (1) whether Plaintiff has alleged a constitutional violation, and (2) whether the violated right was "clearly established" at the time of the violation. *Id.* at 230–31. "The judges of the district courts . . . [may] exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236. Qualified immunity is applicable unless the plaintiff can satisfy both prongs of the inquiry. *Id.* at 232. When a defendant asserts the defense of qualified immunity, the burden shifts to the plaintiff to overcome the asserted immunity. *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009).

Qualified immunity is immunity from suit, rather than a mere defense to liability. *Estate of Reat v. Rodriguez*, 824 F.3d 960, 964 (10th Cir. 2016) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). If a court finds that a defendant is subject to qualified immunity, the court may dismiss with or without prejudice. *Breidenbach v. Bolish*, 126 F.3d 1288, 1294 (10th Cir. 1997); *Lybrook v. Members of Farmington Mun. Sch. Bd. of Educ.*, 232 F.3d 1334, 1342 (10th Cir. 2000).

Plaintiff alleges that Montrose County Defendants were deliberately indifferent to Blodgett's serious medical needs in violation of § 1983. Claims based on suicide while in jail are "considered and treated as claims based on the failure of jail officials to provide medical care for those in their custody." *Barrie v. Grand Cnty., Utah*, 119 F.3d 862, 866 (10th Cir. 1997). Such claims are judged under the "deliberate indifference to serious medical needs" test established by the Supreme Court in *Estelle*, 429 U.S. at

104.[6]  The "deliberate indifference" test has an objective and subjective component: (1) the harm suffered must be sufficiently serious; and (2) the prison official must know of and disregard an excessive risk to inmate health or safety.  *DuBois v. Payne Cnty. Bd. of Cnty. Comm'rs*, 543 F. App'x 841, 846 (10th Cir. 2013).  In the context of liability for prison suicide, "the risk of, or potential for, suicide involves a sufficiently serious medical need and/or harm such that the objective prong . . . is met."  *Id.*  The subjective component requires the defendant to have knowledge that the specific inmate in question presented a substantial risk of suicide.  *Cox v. Glanz*, 800 F.3d 1231, 1250 (10th Cir. 2015).  The main inquiry on this motion to dismiss is whether Plaintiff adequately alleges facts to support the subjective prong and the mental state of each Montrose County Defendant.

Supervisory officials may also be held liable in their individual capacity.  Section 1983 does not allow claims against supervisors under a theory of *respondeat superior* liability.  *Cox*, 800 F.3d at 1248 n.9.  A § 1983 claim against a defendant is his personal

_____

[6] In *Estelle*, the Supreme Court held that deliberate indifference to serious medical needs of a prison constitutes cruel and unusual punishment under the Eighth Amendment.  *Estelle*, 429 U.S. at 104.  The legal standards governing a prisoner's right to constitutionally adequate medical care have been developed almost entirely under the Eighth Amendment's "cruel and unusual punishments" clause.  But "Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions."  *Ingraham v. Wright*, 430 U.S. 651, 702 n.40 (1977).  Thus, for pretrial detainees, the source of the constitutional right to adequate medical care is the Fourteenth Amendment, not the Eighth.  *See Bell*, 441 U.S. at 535 & n.16.  This distinction between the Eighth and Fourteenth Amendments has long been treated as one without a difference.  *See, e.g.*, *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002) (noting the distinction but stating that a "claim for denial of medical attention" in pretrial custody proceeds under "an analysis identical to that applied in Eighth Amendment cases").  No party raises any issue of whether the Supreme Court's decision in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), changed the standard for Fourteenth Amendment claims based on the denial of medical care.

capacity for supervisory liability "allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, or implements a policy which subjects, or causes to be subjected that plaintiff to the deprivation of any rights secured by the Constitution." *Id.* at 1248 (alterations incorporated). Thus, a plaintiff must show that a subordinate violated the Constitution and an affirmative link between the supervisor and the constitutional violation. *Id*. An "affirmative link" requires "(1) personal involvement, (2) sufficient causal connection, and (3) culpable state of mind." *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010).

As for the second element of qualified immunity, the plaintiff bears the burden of demonstrating that the law was clearly established at the relevant time. *Lybrook*, 232 F.3d at 1337. "A plaintiff may show clearly established law by pointing to either a Supreme Court or Tenth Circuit decision, or the weight of authority from other courts, existing at the time of the alleged violation." *T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017). To be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017). "Although there need not be a case directly on point, an officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it." *Knopf v. Williams*, 884 F.3d 939, 944 (10th Cir. 2018) (alterations incorporated and citations omitted).

a. *Sergeants Iverson, McNulty, and Strait*

Plaintiff fails to allege a constitutional violation by Sergeants Iverson, McNulty, and Strait under either direct or supervisory liability. The First Amended Complaint does not identify any action (or inaction) by Sergeants Iverson, McNulty, and Strait. These sergeants are never mentioned by name, apart from being identified as defendants in this matter. (ECF No. 54 ¶ 30–32.) Conclusory allegations which lump together all "Montrose County Defendants" are not a sufficient basis to state sufficient to state a claim against each sergeant for deliberate indifference. The total lack of allegations as to their individual conduct fails to provide these defendants notice of the claims against them. *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008) (holding that a complaint raising § 1983 claims failed "to isolate the allegedly unconstitutional acts of each defendant, and thereby [did] not provide adequate notice as to the nature of the claims against each").

In addition, the First Amended Complaint is also devoid of any allegation that these sergeants were the supervisors of the "jail staff" or other unidentified actors in the First Amended Complaint. Instead, Plaintiff merely pleads that "Montrose Defendant Sergeants . . . were employed in supervisory capacities of all MCDC deputies." (ECF No. 54 ¶ 94.) However, Plaintiff does not allege facts showing that these sergeants personally participated, exercised control, or failed to supervise "jail staff" or others at MCDC. Absent allegations that these sergeants supervised the unnamed staff who allegedly committed a constitutional violation, Plaintiff has not plausibly alleged an affirmative link between the supervisors and a constitutional violation.

Under the facts alleged, Plaintiff has not plausibly alleged a constitutional violation by these three sergeants and has not overcome their assertion of qualified immunity. The Court thus dismisses the individual claims against Sergeants Iverson, McNulty, and Strait without prejudice.

        b.    *Sergeant Strole*

To allege a constitutional violation for deliberate indifference, Plaintiff must plausibly plead that Sergeant Strole knew of and disregarded an excessive risk to Blodgett's health or safety. *See DuBois*, 543 F. App'x at 846. Plaintiff fails to do so.

Unlike the allegations against the other sergeants, Plaintiff identifies Sergeant Strole by name in the First Amended Complaint and states specific actions taken her. (ECF No. 54 ¶¶ 44–45.) Sergeant Strole asked Klienapfel to evaluate Blodgett after intake and received a recommendation from Klienapfel that Blodgett receive mental health services. (*Id.*; ECF No. 84-1 at 1.) Notably, Klienapfel's recommendation did not indicate to Sergeant Strole that Blodgett harbored any suicidal tendencies. While Sergeant Strole should have been aware that Blodgett should receive some mental health services in the future, Plaintiff cannot extrapolate Klienapfel's recommendation to support a claim that Sergeant Strole knew Blodgett was suicidal and disregarded that risk. Under the circumstances, the allegations against Sergeant Strole do not rise to the level of deliberate indifference.

Nor does Plaintiff allege any claim of supervisory liability against Sergeant Strole. For the reasons discussed above regarding the supervisory claims against the other sergeants in Part III.B.4.a, the Court finds that Plaintiff has not stated a claim for

supervisory liability against Sergeant Strole.

Thus, the Court finds that Plaintiff has not alleged a constitutional violation by Sergeant Strole, and Plaintiff has not overcome the assertion of qualified immunity. The Court thus dismisses the claims against Sergeant Strole without prejudice.

      c.    *Commander Miller*

Plaintiff has plausibly pled that, at a minimum, Commander Miller knew that Blodgett could be a serious medical risk and disregarded that risk. Commander Miller received the e-mail from Blodgett's public defender notifying him that Blodgett had previously been on suicide watch. (ECF No. 54 ¶ 49.) While the exact contents of this e-mail are presently unknown, this allegation raises a question of material fact of whether Commander Miller had notice of previous suicide attempts by Blodgett, or whether he should have taken further steps to inform other prison officials, consistent with MCSO policy.

Viewing this allegation in the light most favorable to Plaintiff, Commander Miller knew of a serious risk to Blodgett's health given his mental health and suicide watch history, and his only response was to confirm that Blodgett was "on the list" for mental health services. Arguably, such knowledge should have triggered an obligation to further report Blodgett's mental health and suicide watch history to all deputies, and to search, segregate, and take "necessary measures" to prevent or eliminate any immediate danger. (ECF No. 54-1.)

Thus, Plaintiff has plausibly pled a factual dispute which, if resolved in his favor, would establish a constitutional violation. In other words, in her First Amended

Complaint Plaintiff has set forth facts which plausibly allege that Miller knew of a serious medical risk to Plaintiff and disregarded it—and in so doing violated the Fourteenth Amendment's injunction against deliberate indifference to the serious medical needs of Mr. Blodgett.

As to the second element of qualified immunity, other than briefly stating the qualified immunity standard (*see* ECF No. 61 at 4, 8), neither party fully addresses whether Commander Miller's alleged violation of Blodgett's constitutional rights was "clearly established" in November 2015. *See Pearson*, 555 U.S. at 232. Typically, once a defendant raises the possibility of qualified immunity, the plaintiff bears the burden of demonstrating that the defendant violated a clearly established constitutional right. *See Cox*, 800 F.3d at 1254 (holding that, where a defendant asserted a qualified immunity defense but did not brief whether the right was clearly established, the plaintiff nonetheless must show that the constitutional violation was grounded in clearly established law). However, it would be overly formalistic for the Court to dismiss Commander Miller because Plaintiff failed to cite to the clearly established law in her response brief, only for Plaintiff to amend her complaint and adequately address the clearly established law prong of qualified immunity. Thus, the Court addresses the issue here.

A review of Tenth Circuit cases shows that, since the mid-1990s, to succeed on a prison suicide deliberate indifference claim, the plaintiff must present facts to suggest that facility staff "had knowledge of the specific risk that [the deceased] would commit suicide." *Estate of Hocker v. Walsh*, 22 F.3d 995, 1000 (10th Cir. 1994); *see also Cox*,

800 F.3d at 1249–50 (describing the "law in our circuit" as requiring "prison officials to possess knowledge that a specific inmate presents a substantial risk of suicide"). As discussed above, based on the e-mail from Hindman, Commander Miller plausibly had knowledge that a specific individual in MCDC custody (here, Blodgett) presented a "substantial risk" of suicide, and disregarded that risk. The Court finds that Plaintiff has pled facts sufficient to support a claim that Commander Miller violated Blodgett's clearly established constitutional rights. Thus, the Court denies the motion to dismiss the claims against Commander Miller in his personal capacity.

> d. *Claim 4*

Plaintiff seemingly challenges the conditions of Blodgett's solitary confinement. Plaintiff does not identify any officer who allegedly committed a constitutional violation by holding Blodgett in solitary confinement. Instead, Plaintiff simply claims "Defendants placed and held" Blodgett in solitary confinement. (ECF No. 54 ¶ 138.). As discussed above, such a sweeping accusation against all Montrose County Defendants does not give the individuals actually responsible notice of the claims against them.[7] *See*

---

[7] Even if had Plaintiff identified the individual(s) allegedly responsible, Plaintiff fails to state sufficient facts to plausibly assert a claim against Montrose County Defendants for holding Blodgett in solitary confinement. To state a claim for relief, Plaintiff would have to provide some facts related to the conditions of Blodgett's confinement beyond some "deprivation of access to programs, recreational time, [and] contact with staff and inmates." (ECF No. 54 ¶ 138.) Moreover, as of 2014, the Tenth Circuit observed that the circuit had "not definitely determined whether a lack of social contact and environmental stimulation rises to an Eighth Amendment violation," and presumably the result is the same under the Fourteenth Amendment. *Silverstein v. Fed. Bureau of Prisons*, 559 F. App'x 739, 755 (10th Cir. 2014).

*Robbins v. Oklahoma*, 519 F.3d at 1250.  Therefore, the Court dismisses individual

capacity claims against Montrose Defendants under Claim 4.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.  CHC Defendants' Motion (ECF No. 59) is GRANTED IN PART and DENIED IN

    PART as follows:

    a.  Claim 2 is DISMISSED;

    b.  Claim 5 is DISMISSED IN PART WITH PREJUDICE as to Adrienne

        Leonard's claims in her personal capacity for § 1983 violations and

        negligence; and

    c.  The remainder of the Motion is DENIED.  The following claims remain

        against CHC: Claim 1 (§ 1983 deliberate indifference); Claim 3 (Wrongful

        Death); and, in part, Claim 5 (the Blodgett Estate's Negligence Claim).

2.  Montrose County Defendants' Motion (ECF No. 61) is GRANTED IN PART and

    DENIED IN PART as follows:

    a.  All claims brought against "Montrose County, Colorado" are DISMISSED;

    b.  Claim 1 is DISMISSED IN PART WITHOUT PREJUDICE as to all parties

        in their official capacity and Sergeants Iverson, McNulty, Strait, and Strole,

        in their personal capacity;

    c.  Claim 2 and Claim 4 are DISMISSED WITHOUT PREJUDICE;

    d.  Claim 5 is DISMISSED WITH PREJUDICE; and

e.    The Motion is DENIED IN PART as to Claim 1 against Commander Miller in his personal capacity;

3.    The stay of discovery (ECF No. 78) is LIFTED;

4.    Parties are instructed to contact U.S. Magistrate Judge N. Reid Neureiter for the purpose of preparing and entering an amended scheduling order with a deadline for amending the pleadings sufficiently in the future to accommodate discovery of the identities of the parties currently named only by their titles; and

5.    Plaintiffs are granted leave to file a second amended complaint within a reasonable time as determined by Judge Neureiter.


Dated this 12th day of December, 2018.

BY THE COURT:

_____
William J. Martínez
United States District Judge