IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 17-cv-2690-WJM-NRN

ESTATE OF DILLON BLODGETT, and
ADRIENNE LEONARD, personally and as personal representative of the Estate of Dillon Blodgett,

    Plaintiffs,

v.

CORRECT CARE SOLUTIONS, LLC,
CORRECTIONAL HEALTHCARE COMPANIES, LLC d/b/a "CORRECTIONAL HEALTHCARE MANAGEMENT, INC.",
BRET CORBRIDGE, in his individual capacity,
LYN LAWHEAD, in her individual capacity, and
KRISTIN LAURIE, in her individual capacity.

    Defendants.

## ORDER GRANTING THE MOTION TO DISMISS AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This lawsuit alleges that Dillon Blodgett received constitutionally deficient medical care while in pretrial detention at the Montrose County Detention Center ("MCDC") in Montrose, Colorado, resulting in Blodgett taking his own life. Plaintiff Adrienne Leonard, personally and as the personal representative of the Estate of Blodgett (the "Blodgett Estate"), sues numerous individuals and entities that are allegedly responsible for Blodgett's death.

Before the Court is a Motion for Summary Judgment ("Motion for Summary Judgment"), filed by Defendants Correct Care Solutions, LLC ("CCS"), Correctional Healthcare Companies, LLC ("CHC"), Bret Corbridge, Lyn Lawhead, and Kristin Laurie (collectively, "Defendants"). (ECF No. 175.)

Also before the Court is the Stipulated Motion to Dismiss Without Prejudice Defendants Bret Corbridge, Lyn Lawhead, and Kristin Laurie ("Stipulated Motion to Dismiss"), filed on September 29, 2020. (ECF No. 196.)

For the reasons explained below, both motions are granted.

## I. BACKGROUND

**A.    Factual Summary**[1]

This case arises from the tragic and untimely death of Blodgett while in MCDC custody. Plaintiff is Blodgett's mother and the personal representative of Blodgett's Estate. (ECF No. 175 ¶ 1.) CCS and CHC contracted with Montrose County to provide medical services to inmates and detainees at MCDC. (*Id.* ¶ 2.) During the relevant time period, CHC was responsible for administering health care services, including mental health services, to inmates and detainees at MCDC. (*Id.* ¶ 14.)

Bret Corbridge, a licenced professional counselor, and Lyn Lawhead, a licensed clinical social worker, provided mental health services at MCDC. (*Id.* ¶¶ 3–4.) Kristin Laurie is a registered nurse and health services administrator at MCDC. (*Id.* ¶ 5.)

    1.    Blodgett's Booking and Intake Screening

Blodgett was booked into MCDC on November 18, 2015. (*Id.* ¶ 11.) During his intake and screening on November 20, 2015, Blodgett denied that he was in special need of medical or other care, denied that he had been receiving mental health

---

[1] The following factual summary is based on the parties' briefs on the Motion and documents submitted in support thereof. These facts are undisputed unless attributed to a party or source. All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.

counseling, and stated that he had previously thought about committing suicide but denied that he was currently thinking about it. (*Id.* ¶ 12; ECF No. 176-1 at 1–2.)

Blodgett was then placed into a maximum-security cell. (ECF No. 175 ¶ 13; ECF No. 175-1 ¶¶ 23–24.)

2.  <u>Blodgett's Mental Healthcare Requests and Treatment</u>

Inmates and pretrial detainees can request medical or mental health care services by submitting written healthcare requests (known as a "kite" or "kites"). (ECF No. 175 ¶ 15.)

On November 21, 2015, Blodgett was seen by Nancy Kienapfel, a licensed mental health care provider at Midwestern Colorado Mental Health Center. (*Id.* ¶¶ 17–18.) According to Kienapfel's evaluation, she categorized Blodgett as a "low risk" of harm, noting that Blodgett has "[n]o current suicidal ideation, plan, intentions, or severe distress, but may have had transient or passive thoughts recently or in the past." (ECF No. 176-3 at 1.) Her session notes state that Blodgett was having "[n]o thoughts about suicide. This is how an average person feels about suicide." (*Id.* at 3.) Nonetheless, Kienapfel recommended that Blodgett receive "High Intensity Community Based [Services]." (*Id.* at 2.)

On November 24, 2015, Blodgett submitted a kite, requesting mental health care for "[e]xtreme anxiety / [d]epression." (ECF No. 175 ¶ 21; ECF No. 176-2 at 1.) Laurie responded, "You are on the list for mental health." (*Id.*)

On November 25, 2015, Laurie performed a "Receiving Screening" on Blodgett. (ECF No. 175 ¶ 22; ECF No. 176-3 at 1.) This section included a "Suicide Potential Screening" section, in which Blodgett provided the following responses:

3

(1) Arresting or transporting officer believes subject may be a suicide risk: NO
(2) Lacks close family/friends in community: NO
(3) Worried about major problems other than legal situation (terminal illness): NO
(4) Family member or significant other has attempted or committed suicide (spouse/parent/sibling/close friend/lover): NO
(5) Has psychiatric history (psychotropic medication or treatment): NO
(6) Holds position of respect in community (professional/public official) and/or alleged crime is shocking in nature.  Expresses feelings of embarrassment/shame: NO
(7) Expresses thoughts about killing self: NO
(8) Has a suicide plan and/or suicide instrument in possession: NO
(9) Has previous suicide attempt: YES (a few months ago)
(10) Expresses feelings there is nothing to look forward to in the future (feelings of helplessness and hopelessness): NO
(11) Shows signs of depression (crying or emotional flatness): NO
(12) Appears overly anxious, afraid or angry: NO
(13) Appears to feel unusually embarrassed or ashamed: NO
(14) Is acting and/or talking in a strange manner (cannot focus attention/hearing or seeing things not there): NO
(15) Is apparently under the influence of alcohol or drugs: NO
(16) If YES to #15, is individual incoherent or showing signs of withdrawal or mental illness: NO
(17) Is this individual's first arrest: NO
(18) Detainee's charges include Murder, Kidnapping and/or Sexual Offense: NO

(ECF No. 175 ¶ 22; ECF No. 176-4 at 2–3.)  To the extent an detainee or inmate answers YES to eight or more questions or answers YES to questions (1), (6), (7), (8), (10), or (16), Laurie was instructed to notify the shift commander and immediately refer the individual for mental health evaluation.  (ECF No. 175 ¶ 23; ECF No. 176-4 at 3.)

4

She was also instructed to notify mental health of any positive response to the suicide screen that did not meet the above criteria for immediate referral. (ECF No. 175 ¶ 23; ECF No. 176-4 at 3.)

On December 2, 2015, Corbridge saw Blodgett in response to his November 24, 2015 kite. (ECF No. 175 ¶ 25.) He found Blodgett to have an appropriate appearance, a depressed mood, and a tearful affect. (*Id.*; ECF No. 176-2 at 2.) During that appointment, Blodgett informed Corbridge that his friend had committed suicide and that it was bringing up some sad feelings and thoughts of wanting to die. (ECF No. 176-2 at 2.) Corbridge diagnosed Blodgett as having depression, anxiety, and some suicidal ideation but determined that Blodgett did not need to start suicide precautions. (*Id.*)

On December 3, 2015, Blodgett was seen by Lydia Storey-Lopez, a representative from Midwestern Colorado Mental Health Center Services. (ECF No. 175 ¶ 27; ECF No. 176-2 at 3–4.) According to her session notes, she "spoke with jail nurse [Laurie] who reports concerns about [Blodgett]. [Blodgett] has been speaking with [Corbridge] . . . he is a therapist who comes in to the jail periodically to see high acuity clients." (ECF No. 176-2 at 3.)

On December 15, 2015, Blodgett submitted a second kite requesting mental health care. (ECF No. 175 ¶ 28; ECF No. 176-2 at 5.) Laurie responded, "You are on the list." (*Id.*)

On January 2, 2016, Blodgett was seen by Lawhead. (ECF No. 175 ¶ 29; ECF No. 176-2 at 6.) She diagnosed Blodgett as having major depression and anxiety. During that meeting, Blodgett had informed Lawhead that he had attempted to hang

himself two months prior while in the department of corrections.  (ECF No. 175 ¶ 29; ECF No. 176-2 at 6.)

On January 11, 2016, Blodgett submitted a third kite requesting mental health care.  (ECF No. 175 ¶ 30; ECF No. 176-2 at 8.)  Laurie responded, "You are on the mental health list."  (*Id.*)

On January 14, 2016, Blodgett was seen by Corbridge.  (ECF No. 175 ¶ 31; ECF No. 176-2 at 9.)  Corbridge found Blodgett to have a depressed mood, a flat affect, and occasional suicidal thought content.  (*Id.*; ECF No. 176-2 at 9.)  He diagnosed Blodgett as having depression and anxiety.  (ECF No. 176-2 at 9.)  Corbridge wrote that during that session, Blodgett was more stable and was communicating better.  (*Id.*)  However, during their discussion of Blodgett's pending escape charge, Blodgett conveyed that he ran because "he was feeling suicidal and needed to get to his parents.  Now everything [is] worse."  (*Id.*)  Nonetheless, Corbridge determined that Blodgett did not need to start suicide precautions.  (*Id.*)

On January 20, 2016, at 11:07 p.m., a security check of Blodgett's cell indicated that he was "OK."  (ECF No. 175 ¶ 35.)  At approximately 11:34 p.m. during another security check, Blodgett was found hanging from his top bunk and was found unresponsive to life-saving attempts.  (*Id.* ¶ 36.)  He was pronounced dead on January 23, 2016.  (*Id.* ¶ 37.)

**B.     Procedural History**

Plaintiff filed this action on November 10, 2017 (ECF No. 1) and filed the First Amended Complaint on March 2, 2018 (ECF No. 54).

6

On December 12, 2018, the Court granted in part and denied in part the motions to dismiss filed by the then-defendants and granted Plaintiff leave to file a second amended complaint. (ECF No. 91.)

On April 1, 2019, Plaintiff filed the Second Amended Complaint, which asserts the following claims against Defendants: (1) deliberate indifference to Blodgett's serious medical needs, in violation of the Fourteenth Amendment against all Defendants ("Claim 1") (¶¶ 87–97); (2) medical negligence causing Blodgett's wrongful death against CHC, CCS, and Kienapfel ("Claim 2") (¶¶ 98–118); (3) a Fourteenth Amendment claim against Defendant Allan Miller ("Claim 3") (¶ 119); and (4) a survival claim against all Defendants ("Claim 4") (¶¶ 120–22).

After the Second Amendment Complaint was filed, Kienapfel was dismissed with prejudice as a Defendant on October 22, 2019 (ECF No. 152) and Miller was dismissed with prejudice as a Defendant on November 7, 2019 (ECF No. 156).

On January 31, 2020, Defendants filed the Motion for Summary Judgment. (ECF No. 175.) Plaintiff responded on March 10, 2020 (ECF No. 187), and Defendants replied on March 20, 2020 (ECF No. 190).

On September 29, 2020, the parties filed the Stipulated Motion to Dismiss Plaintiffs' claims against the individual (non-corporate) Defendants. (ECF No. 196.)

## II.  STIPULATED MOTION TO DISMISS (ECF No. 196)

In the Stipulated Motion to Dismiss, the parties jointly move to dismiss Plaintiff's claims against Corbridge, Lawhead, and Laurie without prejudice, with each party to pay its own costs and attorneys' fees. (ECF No. 196 at 1.) The Court grants the Stipulated Motion to Dismiss for good cause shown.

### III.  MOTION FOR SUMMARY JUDGMENT (ECF No. 175)

A.  **Summary Judgment Standard of Review**

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).  A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim.  *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001).  An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial.  *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

B.  **Claim 1—Deliberate Indifference**

CHC and CCS are business entities, not natural persons.  In the Tenth Circuit, a business entity working on the government's behalf can only be liable under § 1983 through the municipal liability framework established by the Supreme Court in *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978).  *See Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003).

Under *Monell*, a municipality—or, here, a private entity under contract to provide services to inmates and detainees at MCDC—can only be liable under § 1983 for damages when the entity's "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [constitutional] injury." 436 U.S. at 694. A plaintiff alleging a municipal liability claim must therefore identify a "government's policy or custom" that caused the injury and then demonstrate 'that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury.'" *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013). A municipal policy or custom may be "(1) an officially promulgated policy; (2) an informal custom amounting to a widespread practice; (3) the decisions of employees with final policymaking authority; (4) the ratification by final policymakers of the decisions of their subordinates; or (5) the failure to adequately train or supervise employees." *Estate of Martinez v. Taylor*, 176 F. Supp. 3d 1217, 1230 (D. Colo. 2016) (citing *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010)).

Plaintiff's deliberate indifference claim is not a model of clarity. However, the Court construes the Second Amended Complaint as alleging a *Monell* claim against CHC and CCS based on a "policy and practice of providing inadequate medical and mental health services to the inmates at [MCDC]," as well as their failure to adequately train their employees to meet inmates' serious medical needs. (¶¶ 59–80.)

Defendants argue that Plaintiff has not established a *prima facie Monell* claim because she has failed to provide evidence suggesting that CHC and CCS had a policy or custom of providing inadequate medical care or failing to train or supervise their

9

employees.[2] (ECF No. 175 at 31.) In response, Plaintiff argues "there was virtually no treatment provided to [Blodgett] to address his substantial risk of suicide" and contends that Defendants' "deficient supervision" of mental health services can be inferred from Lawhead's testimony that she was not sure that she had ever seen the MCDC jail policies on procedures for evaluating risk of suicide. (ECF No. 187 at 16–17.)

The Court finds that Plaintiff has failed to establish a genuine dispute of material fact relating to whether CHC and CCS maintained a policy or custom of providing inadequate medical care or failing to train or supervise their employees. On a broad level, because Plaintiff has not provided evidence about the medical standards of care applicable to CHC and CCS's staff, Plaintiff cannot establish that Defendants maintained a policy or custom of providing *inadequate* medical care or failing to train its medical staff. Moreover, what constitutes adequate medical care or adequate medical training for counselors, nurses, and social workers is beyond the common knowledge of a lay jury, and Plaintiff has not retained an expert witness to testify about these topics.

To be clear, the expert report created by Dr. Gutierrez, Plaintiff's sole expert witness, includes the following conclusory statement:

> Appropriate care for individuals at risk of suicide requires on-going assessment and tailoring the interventions offered to

---

[2] Defendants argue that Plaintiff's expert, Dr. Peter M. Gutierrez, is not qualified to render opinions against Laurie, Corbridge, or Lawhead because he has no experience in nursing or experience with mental health care or suicide in the correctional setting. (ECF No. 175 at 22–30.) The Court need not resolve this dispute at this juncture because Defendants have not filed a motion under Federal Rule of Evidence 702 to exclude Dr. Gutierrez's testimony. At any rate, the Court notes that Dr. Gutierrez's expert report seems to be focused on general warning signs of suicide, not the specific standards of medical care applicable to nurses, counselors, or social workers. (ECF No. 175-18; *see also* ECF No. 187 at 15 (Plaintiff recognizes that "Dr. Gutierrez is being offered as an expert witness to discuss risk for suicide among humans in general.").)

> the current risk status. There are multiple approaches that
> can be taken to assess risk, but single yes/no questions with
> no follow-up are not sufficient. . . . Offering an inmate a
> follow-up appointment in four weeks or responding to a
> request for mental health counseling with 'you're on the list',
> . . . do not meet that standard.

(ECF No. 175-18 at 7 (internal citations omitted).) This analysis, however, does not explicitly identify Defendants' specific mental health care policies or procedures, does not discuss the relevant medical standards applicable to nurses, counselors, or social workers, does not explain *why* the medical and mental health services provided by CHC or CCS staff to inmates is inadequate, and does not discuss how CHC and CCS's training or supervision of staff is inadequate. In short, Plaintiff has not established a genuine issue of material fact that CHC and CCS had a maintained a policy or custom of providing inadequate medical and mental health services to MCDC inmates and/or failing to train or supervise their employees to meet inmates' medical needs.

Moreover, even if Plaintiff could establish that CHC and CCS maintained such a policy or custom, Plaintiff has failed to provide evidence demonstrating a direct causal connection between Blodgett's suicide and CHC or CCS's specific policies or customs.[3]

Accordingly, the Court finds that Plaintiff has failed to provide a genuine issue of

---

[3] The Court notes that Plaintiff has also not provided evidence suggesting that CHC and CCS's purported failure to train its employees evidences deliberate indifference. *See Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1284 (10th Cir. 2019) (recognizing that claims of inadequate training and supervision require a plaintiff to "demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences"). Plaintiff contends "[w]hile[ ] there has been evidence of training in the record, the failure of [CHC and CCS] to adequately supervise the provision of mental health care is obvious as are the results." (ECF No. 187 at 18.) Plaintiff does not, however, provide any evidence to support this contention.

material fact supporting its *Monell* claim against CHC and CCS.  The Court will therefore grants Defendants' Motion for Summary Judgment as to this claim.

**C.      Claim 2—Medical Negligence Causing Wrongful Death**

Plaintiff also asserts a negligence/wrongful death claim against CHC and CCS under two theories of negligence, both of which rest on imputed liability for acts of employees: (1) direct liability for failure to train or supervise employees; and (2) vicarious liability for the negligent acts or omissions of its agents.  (¶¶ 98–118.)

Defendants argue that because "[t]his case involves complex medical and mental health issues that are outside the realm of lay knowledge," "expert testimony is required."  (ECF No. 175 at 38.)  In particular, they argue that Plaintiff's sole expert, Dr. Gutierrez, has not "offer[ed] any opinions in his report that any of the [individuals involved] violated their respective standards of care."  (*Id.* at 37.)

In a negligence action against a licensed professional in Colorado, a "practicing professional is generally entitled to be judged according to the tenants of the school of practice which the practitioner professes follows."  *United Blood Servs. v. Quintana*, 827 P.2d 509, 520 (Colo. 1992) (en banc).  Because the applicable standard of care in most professional negligence cases is not within the common knowledge and experience of members of the jury, the applicable standard of care must be established by expert testimony.  *Id.*; *Williams v. Boyle*, 72 P.3d 392, 397 (Colo. App. 2003) ("[e]xpert testimony is required to establish a prima facie case of professional negligence in the great majority of cases"); *Melville v. Southward*, 791 P.2d 383, 387 (Colo. 1990) (en banc) (recognizing that medical malpractice cases generally require expert testimony because "matters relating to medical diagnosis and treatment ordinarily involve a level

of technical knowledge and skill beyond the realm of lay knowledge and experience"). "Without expert opinion testimony in such cases, the trier of fact would be left with no standard at all against which to evaluate the defendant's conduct." *United Blood Servs.*, 827 P.2d at 520 (internal citation omitted).

Plaintiff's negligence claims relate to the CHC and CCS's alleged failure train or supervise and alleged vicarious liability for the acts of its agents, *i.e.*, Corbridge (a licensed counselor), Lawhead (a licensed social worker), and Laurie (a licensed nurse). Plaintiff will need to establish that CHC and CCS's medical staff received insufficient training or failed to exercise the requisite standard care in treating Blodgett.[4] The standard of care for each of these medical professionals is beyond the competence of a lay jury and, as explained in Part III.B, Plaintiff has no expert witness on the subject.[5]

Accordingly, the Court finds that Plaintiff has failed to make out a *prima facie* clam of medical negligence causing wrongful death. The Court will therefore grant Defendants' Motion as to this claim as well.

---

[4] The Second Amended Complaint alleges that Defendants' duties are informed by Colo. Rev. Stat. § 16-3-40[1(2)], which provides that "[p]ersons arrested or in custody shall be treated humanely and provided with adequate food, shelter, and, if required, medical treatment." (¶ 108.) This statute, which is part of Colorado's Code of Criminal Procedure, does not establish a specific standard of care that nurses, counselors, or social workers must utilize in treating patients.

[5] Dr. Gutierrez's expert report broadly states that the "[a]ppropriate care for individuals at risk of suicide requires on-going assessment and tailoring interventions offered to the current risk status." (ECF No. 175-18 at 7.) Dr. Gutierrez does not, however, provide any evidence about the requisite *standard of care* applicable to nurses, counselors, or social workers. Nor is there any evidence that he is qualified to do so.

### D.     Claim 3—Survival Claim

Plaintiff's survival claim is premised on a wrongful act of the Defendants. (*See* ¶ 122 ("Because of the deliberate indifference and/or negligence of Defendants as described above, Plaintiff has suffered injuries and damages, including, but not limited to expenses.").)

Because Plaintiff has failed to make a *prima facie* claim against Defendants, Plaintiff's survival claim also fails as a matter of law. *See Sager v. City of Woodland Park*, 543 F. Supp. 282, 289 (D. Colo. 1982) (recognizing that "a § 1983 survival action . . . is essentially the assertion of the cause of action that the deceased would have had had he lived, requesting damages for violation of the decedent's rights").

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. The Stipulated Motion to Dismiss Without Prejudice Defendants Bret Corbridge, Lyn Lawhead, and Kristin Laurie (ECF No. 196) is GRANTED;

2. Defendants Bret Corbridge, Lyn Lawhead, and Kristin Laurie are hereby DISMISSED WITHOUT PREJUDICE from this action, with each party to pay his or her own attorney's fees and costs;

3. Defendants' Motion for Summary Judgment (ECF No. 175) is GRANTED;

4. The Clerk shall enter judgment in favor of Defendants Correct Care Solutions, LLC and Correctional Healthcare Companies, LLC and against Plaintiffs and shall terminate this case; and

5. Plaintiffs and Defendants Correct Care Solutions, LLC and Correctional Healthcare Companies, LLC shall bear their own costs with respect to the claims asserted against these Defendants.

Dated this 30th day of September, 2020.

BY THE COURT:

William J. Martínez
United States District Judge